## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

---

| | |
|---|---|
| IN RE:  TE-KON TRAVEL COURT, INC., | Case No. HK 04-01848 |
| Debtor. | Chapter 11 |
| _____/ | Honorable Jeffrey R. Hughes |
| | |
| IN RE:  TE-KHI TRAVEL COURT, INC., | Case No. HK 04-01847 |
| Debtor. | Chapter 11 |
| _____/ | |
| | |
| IN RE:  TE-KHI SERVICE CENTER, INC., | Case No. HK 04-01849 |
| Debtor. | Chapter 11 |
| _____/ | |
| | |
| IN RE:  PETROLEUM HOLDINGS, INC., | Case No. HK 04-01850 |
| Debtor. | Chapter 11 |
| _____/ | |

## SIXTH AMENDED JOINT DISCLOSURE STATEMENT

Te-Kon Travel Court, Inc., Te-Khi Travel Court, Inc., Te-Khi Service Center, Inc., and Petroleum Holdings, Inc., Debtors and Debtors-in-Possession in the above-referenced Jointly Administered Chapter 11 Proceedings (the "Debtors"), provide this Sixth Amended Joint Disclosure Statement (this "Disclosure Statement") in order to disclose information deemed by the Debtors to be material important and necessary for their creditors to make a reasonable and informed decision in evaluating the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization (the "Plan").

**This Disclosure Statement summarizes the Plan and also provides information concerning the events leading up to the Debtors' submission of the Plan which the Debtors believe is relevant in making a determination concerning the merits of the Plan, but does not purport to be a complete description of each provision of the Plan. Creditors and parties-in-interest are therefore urged to read the Plan in its entirety.**

**The Debtors believe that confirmation and implementation of the Plan is preferable to any other alternative because it will result in greater and more timely distributions to holders of Claims than a liquidation under Chapter 7 of the Bankruptcy Code. The Debtors, therefore, strongly recommend that creditors vote to <u>accept</u> the Plan.**

Certain capitalized terms used throughout this Disclosure Statement are defined in Article I of the Plan unless defined elsewhere in this Disclosure Statement or in the Plan. Other capitalized terms shall have the meaning ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules and shall be construed in accordance with the Rules of Construction thereunder.

# ARTICLE I

# INTRODUCTION

This Disclosure Statement relates to the Plan filed by the Debtors on May 3, 2006.

The Debtors believe the contents of this Disclosure Statement are complete and accurate and they have made a careful effort to be accurate in all material respects. However, except where expressly indicated, the information contained in this Disclosure Statement has neither been subject to nor is the result of, a certified audit. Accordingly, the Debtors are not able to warrant or represent that the information is certifiably accurate.

Some material contained in this Disclosure Statement has been taken directly from other readily accessible documents or are digests of information from other sources. While every effort has been made to retain the original meaning of the transposed material, the Debtors urge that any reliance on any such materials should depend on a thorough review of the relevant instrument or other sources.

The Debtors reserve the right to amend, modify or supplement the Plan at any time before the Confirmation Date, provided that any such amendments or modifications do not materially alter the treatment of, or distributions to, holders of claims or interest under the Plan.

Approval of the legal adequacy of this Disclosure Statement by the Bankruptcy Court is not a certification by the Bankruptcy Court as to the truth or accuracy of the factual matters that are contained in this Disclosure Statement.

The confirmation and effectiveness of the Plan are subject to material conditions precedent, some of which may not be satisfied. There can be no assurance that those conditions will be satisfied. The Debtors presently intend to seek to consummate the Plan and to cause the Effective Date to occur. The Effective Date is defined in the Plan and will be established if the Court confirms the Plan at the hearing to confirm the Plan. Procedures for distributions pursuant to the Plan, including matters that are expected to affect the timing of the receipt of distributions by holders of claims and interests in certain classes and that could affect the amount of distributions ultimately received by such holders, are described in Article V.

# ARTICLE II

# CIRCUMSTANCES GIVING RISE TO THE FILING OF THE CHAPTER 11 PETITIONS AND DEVELOPMENTS DURING THE CASE

## A.    The Debtors' Businesses

Prior to the Petition Date, the Debtors operated two full service truck stops and service centers in southern Michigan. Each Debtor has continued to operate its business after the Petition Date as a Debtor-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Specifically, each individual Debtor's operations are as follows: Te-Kon Travel Court, Inc. ("Te-Kon") operates a full service truck stop and service center in Te-Konsha, Michigan. Te-Khi Travel Court, Inc. ("Te-Khi") operates a full service truck stop and service center near

2

Battle Creek, Michigan at the intersection of Route M-60 and Interstate 94. Te-Khi Service Center, Inc. ("Service Center") operates a truck and heavy equipment service and repair operation at the Te-Khi location. Petroleum Holdings, Inc. ("PH") serves as a management and payroll company for each of the other Debtor entities.

Collectively, the Debtors have approximately 115 employees and utilize approximately 150 suppliers, many of whom are located in Michigan.

## B.    The Debtors' Pre-Petition Debt and Equity Structure

The Debtors are each organized under the laws of the State of Michigan. The Debtors' corporate offices are generally located at the Te-Khi facility near Battle Creek, Michigan. The Debtors are each independent Michigan corporations. The equity in each of the Debtor entities is owned one hundred percent (100.00%) by Stephen K. Bedwell ("Bedwell").

The Debtors estimate that, in the aggregate, they have over 150 creditors, senior secured debt in the aggregate principal amount of approximately $6,541,254, unsecured trade indebtedness of approximately $1,036,526.43, and other unsecured indebtedness.

Of the total unsecured trade debt, $363,901.48 is owed by Te-Kon, $523,277.98 is owed by Te-Khi, $145,524.47 is owed by Service Center, and $6,995.52 is owed by PH.

## C.    The Senior Secured Debt

The senior secured debt of the Debtors is owed to two creditors. Approximately $2,850,629 in aggregate principal is owed jointly by Te-Kon and PH to the FMAC Loan Receivables Trust 1998-C (the "1998-C Trust"). Approximately $3,690,624 in aggregate principal is owed jointly by all of the Debtors to the FMAC Loan Receivables Trust 1998-D (the "1998-D Trust") (The 1998-C Trust and the 1998-D Trust collectively, the "Trusts"). U.S. Bank, National Association, serves as Trustee for the benefit of the Trusts (the "Agent Bank").

Collateral for the debt owing to the 1998-C Trust consists of a first-priority security interest in all of Te-Kon and PH's real and personal property including all equipment, inventory, accounts receivable, bank accounts, certificates of deposit, contract rights, general intangibles arising from or held in connection with the operation of Te-Kon's or PH's businesses, goodwill, trademarks, trade names, franchise rights, books and records relating to the collateral including computer data and all additions to proceeds and products of the collateral (collectively, the "1998-C Collateral").

Collateral for the debt owing to the 1998-D Trust consists of a first-priority security interest in all of Te-Khi and Service Center's real and personal property including all equipment, inventory, accounts receivable, bank accounts, certificates of deposit, contract rights, general intangibles arising from or held in connection with the operation of Te-Khi's and Service Center's businesses, goodwill, trademarks, trade names, franchise rights, books and records relating to the collateral including computer data and all additions to proceeds and products of the collateral and a junior lien on the assets of Te-Kon and PH (collectively, the "1998-D Collateral", and together with the 1998-C Collateral, the "Collateral").

3

Because the Collateral consists of substantially all of the Debtors' prepetition assets, and the value of the Collateral is substantially less than the amount of the claims secured by such Collateral, the 1998-C Trust and 1998-D Trust are undersecured.

The Debtors, the Debtors' principal, Stephen Bedwell, and the 1998-C and 1998-D Trusts entered into a Settlement Agreement on September 1, 2005 (the "Trusts Settlement Agreement"), which resolves the disputes between the Debtors and the Trusts, and provides for the agreed treatment of the Trusts' Claims under the Plan.

## D.    Events Leading to Filing

Several unrelated events led to the deterioration of the Debtors' collective financial condition. These events caused (a) a strain on the cash flow of each entity and (b) reduced, or eliminated, profits.

There were two power system failures in 2000 at the Te-Konsha location. These failures prevented fuel sales from this location for a total of six days and created significant business interruption in all profit centers. Te-Kon filed a business interruption claim with Auto Owners Insurance for lost sales of $252,000 and damaged equipment totaling $76,000. This claim was settled with the approval of the Bankruptcy Court in August, 2004 for $100,000.00. The significant cash outlays with respect to the repairs as well as the lost revenues in connection with this incident had a significant impact on the Debtors' financial condition.

In November 2001, a portion of the Te-Konsha and Battle Creek locations were leased to an unrelated tire sales and service business (Glen's Tire Company, Inc.). Shortly after taking possession, the tenant defaulted on the leases and filed for bankruptcy protection. This severely impacted the Debtors' cash flow. Any potential claim or cause of action against Glen's Tire Company, Inc. will be liquidated for the benefit of the unsecured creditors by the Litigation Trust (See Article III, Section G for a description of the purpose and function of the Litigation Trust.)

From May through December, 2003, a large section of Interstate 69 was closed for repair resulting in the temporary closure of the freeway exit to Debtors' Te-Konsha location. Subsequently, a section of this highway to the north of Debtors' location was also closed for repair. These repairs were not completed until December, 2004. During this period, Both Te-Kon and the Te-Konsha branch of Te-Khi Service operated at this location. The Debtors' operations rely upon highway traffic and specifically truck traffic for their customer base. As a result of the lengthy highway closings, the Debtors suffered significant cash flow reductions and lost profits.

The Debtors and Dr. Stephen Bedwell filed a lawsuit in early 2003 against the previous co-owner of the businesses, Michael Madden, for breach of contract, breach of fiduciary duty and fraud. The factual basis for the Debtors' suit against Madden involves representations made by Madden in connection with Te-Khi's and Te-Kon's pre-petition lease arrangement with Glen's Tire Company, Inc. The Lease arrangement was terminated after Glen's Tire Company filed its own bankruptcy proceeding. The Debtors believe that Madden's

4

actions significantly impaired the Debtors' ability to operate efficiently. This, together with the time and expense involved in the lawsuit, negatively affected cash flow for all the Debtors.

Michigan's slowing economic climate and its inflated gas and diesel fuel taxes (as compared to nearby Indiana) also contributed to the Debtors' financial problems.

As a result, Debtors defaulted under the terms of their secured loan facility with the Bank. The Bank accelerated the loans and commenced collection proceedings against the Debtors. This, in combination with the other factors set forth above, led the Debtors to seek bankruptcy protection.

### E.    Post Bankruptcy Events

The Chapter 11 Cases were commenced on February 23, 2004, upon the filing of voluntary petitions for relief for each Debtor with the Bankruptcy Court.

The Debtors retained professionals to assist them in the administration and prosecution of this Chapter 11 Case. Miller, Johnson, Snell & Cummiskey, P.L.C. was retained as general bankruptcy counsel and Rumsey & Watkins, P.C. were retained as accountants.

On March 10, 2004, after notice and a hearing, the Bankruptcy Court entered its Final Order Authorizing Use of Cash Collateral and Providing Adequate Protection (as subsequently amended or extended, the "Cash Collateral Order"). The Cash Collateral Order provided Debtors with the access to their cash collateral for purposes of continuing operations.

Since then the Debtors have been authorized, and have continued to operate their businesses as Debtors-in-Possession under the jurisdiction of the Bankruptcy Court, pursuant to the provisions of the Bankruptcy Code and the Cash Collateral Order. Since the inception of these proceedings, the Debtors have filed detailed monthly reports and accounts showing all receipts and disbursements. These documents are on file with the Bankruptcy Court in Grand Rapids, Michigan and may be reviewed by any party in interest in these proceedings.

Prior to filing their bankruptcy petitions, the Debtors retained Vincent Bedwell as their operations manager. During these proceedings, Mr. Bedwell has been directing the Debtors' efforts toward reducing overhead expenses. Among other things, the Debtors have been able to replace a number of managers with more qualified and efficient individuals. As a result of Vincent Bedwell's efforts, the Debtors have reduced total annual wage costs by $220,784, a ten and four-tenths percent (10.40%) reduction from 2003 and reduced other operating expenses by $106,553, a twelve and seven tenths percent (12.70%) reduction from 2003. The Debtors have also been working on a plan of merger in order to further reduce overhead.

Since the bankruptcy filing, Debtors Te-Khi and Te-Kon also discovered some embezzlement in their organizations. The individuals responsible for the crimes were immediately fired and actions against them for compensation have been commenced. To date, one former employee has pled guilty to embezzling $7,361 from Te-Khi during November and December, 2003. This money has been paid back to Te-Khi. Debtors have made numerous modifications to their cash handling control procedures to prevent, detect and correct any further

theft or embezzlement. These changes include improved segregation of duties, modifications to the handling of deposits, implementation of the tracking logs with the Debtors' bank, outsourcing of monthly reconciliation for all checking accounts, frequent unannounced audits, and the addition of digital video surveillance systems.

The Debtors' reorganization was slowed by the discovery of contaminants in the soil and ground water on the Debtors' properties in April 2004. This was an important discovery because the extent of the contamination and the cost of cleanup would not only affect the Debtors' cash flow, it would affect the value of the Bank's collateral and therefore the amount of the Bank's Secured Claim. Since this discovery, Debtors have retained consultants who, after obtaining an extension to November 30, 2004, filed required reports with the Michigan Department of Environmental Quality. These reports indicated the need for further tests. Importantly, however, as a result of the reports, the Debtors have determined that the costs of these tests and any necessary clean-up are likely to be less than $50,000 for each site (less than $100,000 in the aggregate). The Debtors also believe all or a portion of the costs will ultimately be covered by insurance. To date, the Debtors have paid in excess of $45,000 of these environmental costs. Additionally, insurers have paid $32,000 of the costs. The balance will be paid by the reorganized Debtors and is reflected in the attached Exhibit C as payments to "BLDI Environmental."

In addition to conducting day-to-day business, the Debtors have vigorously pursued a variety of alternatives which would increase cash flow and assist in the successful completion of their reorganization. These include possible affiliation with a nationally recognized truck stop chain and a national restaurant chain.

The Debtors have also aggressively pursued alternative financing which will allow them to satisfy their obligations under the Plan. In this regard, Debtors have received term sheets from a variety of lenders and loan brokers. Debtors' principal has funded finder's fees which are spread across several lenders. Debtors are also exploring the option of refinancing through the United States Department of Agriculture ("USDA") with the assistance of First American Capital and Eclipse Consulting. Refinancing through the USDA is appealing to the Debtors due to the length of term offered and the lower interest rates. Debtors efforts with respect to this refinancing have been slowed due to the uncertainty surrounding the cost of the environmental issues discussed above and the failure of the 1998-C Trust and the 1998-D Trust to identify the amounts they would accept to release their liens against Debtors' assets. The amounts payable to the 1998-C Trust and 1998-D Trust were determined in conjunction with the Trusts Settlement Agreement. As a result, Debtors now know the amount of financing necessary to satisfy these obligations. The positive information recently received concerning the contamination issue will also allow the Debtors to solicit specific financing proposals. As a result, Debtors expect to obtain one or more firm financing proposals from prospective lenders within several months of Plan Confirmation.

In January 2006, the Debtors also resolved their disputes with Michael Madden, one of the Debtors' former shareholders. The terms of the settlement with Mr. Madden have been approved by the Bankruptcy Court. These terms include Mr. Madden's agreement to withdraw his secured claim of over $966,000 and retain a Class 5 unsecured claim of $730,000 in its place. Pursuant to the settlement, the Debtors are also receiving approximately $35,000 in

exchange for dropping all further actions against Mr. Madden. The other terms of the settlement are set forth in the settlement agreement which was previously served on all interested parties in this case. Although it is difficult to quantify the exact monetary benefit of this settlement, the Debtors believe the resolution of their disputes with Mr. Madden significantly increases the likelihood of a successful reorganization.

## ARTICLE III

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.     Continued Corporate Existence and Vesting of Assets In Consolidated Entity**

The Debtors' Plan is premised upon the post-Effective Date consolidation of each of the Debtor entities into a single entity.

Except as otherwise provided in the Plan, as of the Effective Date, all property of the respective Estates of the Debtors will vest in the Consolidated Entity, free and clear of all Claims, liens, charges, other encumbrances and Interests. Pursuant to the Consolidation Merger, the Debtors will be merged into the Consolidated Entity, which, as the Consolidated Entity, will continue to exist after the Effective Date, with all the powers of a corporation under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law. On and after the Effective Date, the Consolidated Entity may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Consolidated Entity may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services, without application to the Bankruptcy Court.

**B.     The Consolidation Merger**

**1.     Consummation of the Consolidation Merger**

Simultaneously with the commencement of the Effective Date, the Debtors will take all such actions as may be necessary or appropriate to effect the Consolidation Merger on the terms and subject to the conditions set forth in the Merger Agreement. Without limiting the generality of the foregoing sentence, the Debtors will cause the Merger Agreement or a certificate of merger conforming to the applicable provisions of the Michigan Business Corporation Act to be filed with the State of Michigan Department of Consumer and Industry Services, Corporations Division pursuant to applicable provisions of the Michigan Business Corporation Act and will take or cause to be taken all other actions, including making appropriate filings or recordings, that may be required by the Michigan Business Corporation Act or other applicable law in connection with the Consolidation Merger. The Merger Agreement will include a provision deeming each share of Old Common Stock cancelled. Such further provisions will be made in or taken pursuant to the Plan or the Merger Agreement as may be necessary or appropriate to result in there being no shares of capital stock of any of the Debtors issued or outstanding immediately following the Effective Date, except as provided in

the Merger Agreement. Thereafter, shares of capital stock of the Consolidated Entity will be issued pursuant to the Plan and may otherwise be issued pursuant to the Consolidated Entity' articles of incorporation and bylaws and the Michigan Business Corporation Act.

**2.      The Consolidated Entity's Obligations Under the Plan.**

From and after the Effective Date, the Consolidated Entity or, if applicable, the Debtors on or after the Effective Date, jointly and severally, will perform the obligations of the Debtors under the Plan.

**3.      Directors and Officers of the Consolidated Entity.**

**a.      Board of Directors**

The initial Board of Directors shall be composed of Stephen Bedwell.

**b.      Officers**

The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Consolidated Entity on and after the Effective Date in accordance with any employment agreement with the Consolidated Entity and applicable nonbankruptcy law.

**4.      Disclosure of Compensation to be Paid to Insiders Post-Confirmation**

Three (3) insiders will be employed by the Debtors and/or Consolidated Entity after Confirmation of the Plan. Pursuant to Section 1129(a)(5)(B), these individuals, their respective duties, and their proposed compensation is as follows:

| Individual | Position | Annual Salary |
|---|---|---|
| Stephen K. Bedwell | President | $135,000.00 |
| Vincent Bedwell | Operations Manager | $ 80,000.00 |
| John Bedwell | General Manager | $ 45,000.00 |

5.      Equity Ownership of Consolidated Entity

Upon the Effective Date and the completion of the Consolidation Merger, Stephen Bedwell shall purchase five thousand (5,000) shares of the New Common Stock in the Consolidated Entity, which shall represent all of the issued and outstanding shares of New Common Stock by paying to the Consolidated Entity the sum of One Hundred Ninety-Four Thousand and no/100 Dollars ($194,000.00) in immediately available funds. The sum to be paid by Stephen Bedwell is based on an appraisal of the fair market value of one hundred percent (100.00%) of the equity in the Consolidated Entity which was recently obtained by the Debtors.

### 6.     Benefits and Risks of Consolidation Merger.

There are numerous benefits to consolidating the Debtors' operations post-Confirmation.  For example, merging the Debtors will substantially reduce the administrative costs.  Only one monthly sales tax return will need to be prepared (rather than the three returns currently required).  One annual federal and state tax return will be required (compared to the four returns which are currently necessary).  The Consolidation Merger will also reduce external accounting costs and legal fees on a going forward basis.  The Consolidation Merger will also reduce the amount of internal paperwork, thereby reducing costs of operations for all Debtors.

Additionally, given that the Debtors (especially Te-Kon and Te-Khi) share many of the same creditors and conduct the same operations (albeit at different locations), consolidating these entities post-confirmation is logical.  While a cursory review of the Debtors' recent financial performance may lead one to the conclusion that the Debtors' Battle Creek operations will have to subsidize the Tekonsha operations if the companies are merged, the Debtors do not believe this is true.  Given the completion of the construction on the highway near the Tekonsha location, Debtors believe business at the Tekonsha location will increase over the next year.  The Debtors believe this increase, together with the efficiencies achieved by merging the entities and the recent closing of Service Center's Tekonsha location will allow the Consolidated Entity to operate profitably at both the Tekonsha and Battle Creek locations.

The risks of merger increase if the predicted increase in Tekonsha business does not occur.  In that case, the Battle Creek operations will be forced to subsidize Tekonsha until profitability occurs.  Even under this scenario, however, Debtors are confident they will be able to meet their Plan obligations to all creditors.

In contrast, liquidation of the Debtors, with or without a merger, will result in no distribution to any of the Debtors' unsecured creditors because of the large amounts owed to the 1998-C Trust and the 1998-D Trust.  Therefore the risks of merger are far outweighed by the cost savings involved in merging the Debtors and thereby reducing the possibility of liquidation.

### C.     Obtaining Cash for Plan Distributions and Transfers of Funds Among the Debtors

All cash necessary for the Consolidated Entity to make payments pursuant to the Plan will be obtained from the Consolidated Entity's cash balances, operations, post-confirmation working capital or any post-confirmation financing arrangements which the Consolidated Entity enters into.  Cash payments to be made pursuant to the Plan will be made by the Consolidated Entity.

### D.     Execution of Agreements and Indentures Related to New Debt

The Debtors are currently seeking an alternative source for financing.  Within twelve (12) months of the Effective Date, one or more of the Debtors or the Consolidated Entity will obtain replacement financing from one or more sources sufficient to satisfy the Trusts Claims.  Debtors proposed, and the Trusts agreed to, this twelve (12) month period in order to allow Debtors to develop a positive financial track record post-confirmation.  This should allow Debtors to obtain a lower interest rate and better terms for their post-confirmation financing.  The Debtors are confident they will obtain the capital necessary to fully fund the Plan in a timely

manner. Based on discussions with their business consultant, Eclipse Capital Group, and other potential lenders, Debtors estimate their chances of obtaining financing within one year of Plan confirmation are at least 80% to 85%. Pursuant to their agreement with the Trusts, if Debtors are unable to obtain financing sufficient to pay the Trusts within one year of Plan confirmation, and are unable to renegotiate their agreement with the Trusts, the Debtors assets will be turned over to the Trusts or liquidated for the Trusts' benefit.

**E.     Settlement Agreement with the Trusts**

The Debtors, their principal, Stephen Bedwell, and the Trusts entered into the Trusts Settlement Agreement in order to resolve all outstanding issues related to the Trust Claims. The Trusts Settlement Agreement contains, among other provisions, various reporting requirements and other obligations of the Debtors to the Trusts in connection with the Debtors and the Consolidated Entity's efforts to obtain the replacement financing referenced above. The Debtors shall comply with all obligations under the Trusts Settlement Agreement. Details concerning the terms of the Trusts Settlement Agreement are set forth in Article V, Section B.2.a. of this Disclosure Statement.

**F.     Deeds In Lieu of Foreclosure**

Upon confirmation of the Plan, Debtors shall execute and deliver to Trusts' counsel Deeds in Lieu of Foreclosure (the "Deeds") to all real estate currently owned by the Debtors which is subject to one or more of the Trusts' mortgages, together with any additional documents reasonably deemed necessary by the Trusts to support said Deeds. Upon execution, the Deeds and related documents shall be held by the Trusts' counsel and unless a default in the terms of the Trusts Settlement Agreement occurs which allows the Trusts to record the Deeds, the Deeds shall be returned to the Debtors upon receipt by the Trusts of all monies due them under the Plan.

**G.     Establishment of the Litigation Trust**

**1.     Creation and Purpose of the Litigation Trust**

Upon confirmation of the Plan, (a) the Litigation Trust will be created and (b) the Litigation Trust Assets shall vest in the Litigation Trust for the benefit of the holders of Allowed Class 5 Claims. The Debtor's and Estate's Causes of Action, including, without limitation, the Avoidance Actions, are expressly preserved for the benefit of the Beneficiaries of the Litigation Trust pursuant to Bankruptcy Code Section 1123(b)(3). The Litigation Trust will be governed by the terms of the Plan without further documentation. The Plan will be the trust document for all purposes. The primary purpose of the Litigation Trust shall be to liquidate the Litigation Trust Assets by prosecuting the Causes of Action and the Avoidance Actions with no objective to continue or engage in the conduct of trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. The Litigation Trust is not directly under the supervision of the United States Trustee.

Because of the fact that potential defendants in the Avoidance Actions may include Insiders of the Debtors, the Debtors propose creation of the Litigation Trust to prosecute these actions as well as other Causes of Action the Debtors may have. In this way, the Debtors

can avoid the potential conflicts involved in attempting to litigate these actions themselves. The Debtors also believe use of the Litigation Trust will be more efficient and productive and provide a greater net benefit to the beneficiaries of the Litigation Trust (i.e. the holders of Allowed Class 5 Claims). Although Debtors cannot guaranty that the Litigation Trust will be successful in recovering any monies, the Debtors believe the value of potential actions identified to date are in excess of $50,000.

### 2. Appointment of the Litigation Trust Manager and Oversight Committee; Removal and Replacement of Litigation Trust Manager.

Upon confirmation of the Plan, the Litigation Trust Manager shall be appointed to manage and administer the Litigation Trust for the benefit of the holders of Allowed Class 5 Claims, subject to the terms and conditions of the Plan. The Litigation Trust Manager shall (a) agree, in writing, to be bound by the terms of the Plan and (b) be bonded in an amount, if any, sufficient to protect the interests of the creditors. Additionally, an Oversight Committee shall be appointed to monitor the Litigation Trust Manager's actions. The Oversight Committee shall consist of up to three (3) Persons. The Creditors' Committee shall have the right to appoint one (1) member and the Debtors shall have the right to appoint two (2) members. In the event a member of the Oversight Committee resigns, if the resigning member was appointed by the Creditors' Committee, the Creditors' Committee shall appoint a new member. In the event the resigning member was appointed by the Debtors, the Debtors or the Consolidated Entity shall appoint a new member. In the event either the Creditors' Committee or the Debtors or the Consolidated Entity fail to appoint a new member to replace a resigning member within twenty (20) calendar days of the resigning member's resignation, the remaining members of the Oversight Committee shall have the right to appoint a new member. The Oversight Committee shall have the authority to remove the Litigation Trust Manager by a majority vote of its members. Such removal shall occur immediately upon transmission of oral or written notice of removal to the Litigation Trust Manager. Concurrently with such removal, the Oversight Committee may appoint a successor Litigation Trust Manager upon one (1) day's written notice to the Debtors or the Consolidated Entity and the United States Trustee. The Litigation Trust Manager is not being appointed by the United States Trustee and is not audited by the United States Trustee.

### 3. Powers and Duties of the Litigation Trust and the Litigation Trust Manager.

The Litigation Trust Manager shall have the following powers and duties:

(a)    The Litigation Trust Manager shall have all power and authority, as a fiduciary of the Litigation Trust, to manage and administer the Litigation Trust and make distributions pursuant to this Plan and orders of the Bankruptcy Court, including, without limitation, the power to open and close accounts at financial institutions and to issue checks on behalf of the Litigation Trust;

(b)    The Litigation Trust Manager shall have all power and authority to engage attorneys, accountants, and other professionals, as the Litigation Trust Manager reasonably determines to be necessary for the administration of the Litigation Trust, including, without

11

limitation, any Professionals previously retained by the Debtor, the Creditors Committee, or any creditor;

(c)     The Litigation Trust Manager shall have the power and authority to receive, collect, deposit, and distribute any funds constituting Litigation Trust Assets in accordance with this Plan;

(d)     The Litigation Trust Manager, an estate representative pursuant to Bankruptcy Code Section 1123(b)(3), shall have the power and authority to initiate, prosecute, compromise, and settle Causes of Action that are or can be brought by the Litigation Trust, including, without limitation, Avoidance Actions, without further notice to interested parties or further order of the Bankruptcy Court;

(e)     The Litigation Trust Manager shall have all power and authority to abandon any of the Litigation Trust Assets that the Litigation Trust Manager determines to be burdensome;

(f)     The Litigation Trust Manager shall have the power and right to appear in, defend, or otherwise be heard as a party in interest in (i) appeals from the Confirmation Order and any proceedings related thereto; (ii) proceedings related to the enforcement or interpretation of the Plan; (iii) proceedings related to modifications or amendments to the Plan; and (iv) proceedings relating to the allowance of claims for compensation or expenses to professional persons employed by or at the expense of the Debtor, the Estate, or the Litigation Trust; and

The Litigation Trust **shall not** have the power to hold or acquire (i) any operating assets of a going-concern business, (ii) a partnership interest in a partnership that holds operating assets, or (iii) fifty percent (50.00%) or more of the equity interest of a Person with operating assets.

## 4.    Responsibilities of the Litigation Trust Manager

The Litigation Trust Manager shall exercise reasonable business judgment to administer the Litigation Trust Assets and to make timely distributions from the Litigation Trust. The Litigation Trust Manager shall use its continuing efforts to dispose of and liquidate the Litigation Trust Assets, make timely distributions, and not unduly prolong the duration of the Litigation Trust. The Litigation Trust Manager shall have responsibility for and authority over all substantive and material decisions respecting the administration of the Litigation Trust, including the timing and amount of all distributions from the Litigation Trust, subject to the terms of the Plan, and the prosecution of any causes of action, all as the Litigation Trust Manager determines is in the best interests of the beneficiaries of the Litigation Trust and consistent with the purposes of the Plan, including ultimate authority regarding any and all decisions relating to the prosecution of all actions, including the engagement of counsel. The Litigation Trust Manager shall have responsibility for filing federal, state and local tax returns for the Litigation Trust.

5.       **Term of the Trust; Report to the Bankruptcy Court.**

The term of the Litigation Trust shall be five (5) years from the Effective Date, unless further extended by the Bankruptcy Court prior to such termination. Every three (3) months after the Confirmation Date until a Final Decree is entered or until otherwise ordered by the Bankruptcy Court, the Litigation Trust Manager shall file a written status report with the Bankruptcy Court regarding the status of the administration of the Litigation Trust and distributions under the Litigation Trust.

6.       **Authority to Grant Releases.**

The Litigation Trust Manager is authorized to release and discharge, to the fullest extent permitted by law, the non-Debtor parties from all Claims and Causes of Action that the Debtors, the Estates, or the Litigation Trust Manager ever had or may have whether known or unknown against such Persons.

7.       **Attorney Client Privilege.**

Any attorney-client privilege, work-product privilege or other privilege or immunity that the Estates are entitled to assert in the Causes of Action or the Avoidance Actions shall vest in the Litigation Trust Manager who shall be entitled to assert such privilege and immunity to the extent that the Debtors were entitled to do so prior to the Effective Date; provided, however, that the Confirmation Order shall provide that the exercise of a waiver of the Estates' attorney-client privilege (including any other applicable privileges or other immunities from disclosure) in connection with requests for documentation and information previously sought or to be sought by governmental agencies or other third parties investigating and litigating matters related to the Debtors shall be deemed as (a) a reasonable exercise of the Litigation Trust Manager's business judgment, as the case may be, and (b) in the best interest of the beneficiaries.

8.       **Payment of Litigation Trust Expenses.**

Expenses of the Litigation Trust will be satisfied by the Litigation Trust Assets, as set forth below. The Litigation Trust Manager may pay Litigation Trust expenses upon receipt of an invoice therefore without the need for further Bankruptcy Court authorization or entry of a Final Order. If the Litigation Trust Manager and any Person cannot agree on the amount or timing of payment of Litigation Trust expenses to be paid to such Person, such amount or timing shall be determined by the Bankruptcy Court.

9.       **Distributions of Trust Assets: Priority of Distributions.**

From time to time in accordance with the provisions of the Plan (but no less frequently than annually), the Litigation Trust Manager shall distribute to the beneficiaries all net cash income plus all net cash proceeds held by the Litigation Trust; provided, however, that the Litigation Trust Manager shall retain such amounts as are reasonably necessary to meet future Liquidation Trust expenses. The Litigation Trust Manager may also withhold from amounts distributable to any Person any and all amounts determined in the Litigation Trust Manager's reasonable discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement. Distributions from the Litigation Trust pursuant to this Section shall

be made to the holders of Allowed Class 5 Claims on a Pro Rata basis. The Distribution provisions of Article VI of the Plan shall govern distributions by the Litigation Trust Manager.

### 10. Investment Powers.

The right and power of the Litigation Trust Manager to invest assets transferred to, and retained by, the Litigation Trust, the proceeds from the sale or liquidation of such assets or any income earned by Litigation Trust, shall be limited to the right and power to invest such assets in demand or time deposits, such as short-term certificates of deposit in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills. Under no circumstances shall the Litigation Trust hold any readily marketable stocks, securities, or other assets.

### 11. Tax Treatment of Litigation Trust.

It is intended that the Litigation Trust be classified for federal income tax purposes as a Litigation Trust pursuant to Treasury Regulations Section 301.7701-4(d) and that the Litigation Trust is a grantor trust subject to the provisions of Subtitle A, Chapter 1, Subchapter J, part I, Subpart B of the IRC that is owned by its Beneficiaries as grantors. Accordingly, it is intended that the beneficiaries of the Litigation Trust be treated as if they had received a distribution from the Estate of the applicable assets transferred to the Litigation Trust and then contributed such assets to the Litigation Trust. As such, notwithstanding anything set forth in the Plan, the Estates and the beneficiaries shall treat the transfer of assets to the Litigation Trust for all purposes of the IRC as a transfer from the Estate to the beneficiaries followed by a deemed transfer by the beneficiaries to the Litigation Trust and the beneficiaries will be treated as grantors and deemed owners of the Litigation Trust. All parties, including the Debtor, Litigation Trust Manager, and all beneficiaries of the Litigation Trust must value all assets transferred to the Litigation Trust consistently and those valuations must be used for all Federal income tax purposes. The Litigation Trust Manager must file returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The income of the Litigation Trust will be treated as subject to tax on a current basis and will be taxed in accordance with the grantor trust rules of Subchapter J of the IRC and other relevant provisions of the IRC. Accordingly, the Litigation Trust Manager will annually file income tax returns for the Litigation Trust and provide statements to the beneficiaries showing their pro rata share of each item of income, gain, loss, deduction, or credit.

### ARTICLE IV

### CLASSES OF CLAIMS AND INTERESTS

Under the Plan, claims against the Debtors are divided into Classes. A "Class" is a category of holders of claims or interests. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section III.A

of the Plan, have not been classified and thus are excluded from the following Classes. There are 6 Classes of Claims and Interests under the Plan, as follows:

**Class 1 Claims**. *Priority Claims against a Debtor.*

**Class 2 Claims**.   Unsecured Claims of $200 or less, and Unsecured Claims against a Debtor that the Claim holder elects by the Voting Deadline to reduce to $200 on the ballot provided for voting on the Plan, which Claims would otherwise be classified in Class 5, absent the existence of this Class 2. A holder of a Claim that would have been classified in Class 5, absent such election, may make this election only as to all of such holder's Claims in Class 2 and Class 5. Therefore, if a Claim holder makes an election to reduce any Class 5 Claim to $200, all of such holder's Class 2 and Class 5 Claims will be reduced to $200 in the aggregate, and no Claims of the Claim holder will remain in Class 5. To obtain classification in Class 2 for multiple Unsecured Claims that aggregate more than $200 and would otherwise be classified in Class 5 absent the existence of this Class 2, the holder of such Claims must elect classification in Class 2 as if such Claims were, in the aggregate, one Claim.

**Class 3 Claims**.   Secured Claims against a Debtor which are not otherwise classified in Class 4.

**Class 4 Claims**.  The Trust Claims.

**Class 5 Claims**.  All Unsecured Claims against the Debtors other than Class 2 Claims.

**Class 6 Interests**.  Interests of the holders of Old Common Stock of the Debtors.

## ARTICLE V

## TREATMENT OF CLAIMS AND INTERESTS

**A.    Unclassified Claims**

**1.    Payment of Administrative Claims**

**a.    Administrative Claims in General**

Except as specified in Section III.A.1. of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or the Consolidated Entity, each holder of an Administrative Claim will receive, in full satisfaction of its Claim, cash equal to the amount of such unpaid Administrative Claim on the Effective Date or, if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which an order allowing such Claim becomes a Final Order. Debtors' estimate that allowed unpaid claims in this Class payable on the Effective Date will total less than $75,000 in the aggregate.

**b.     Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to Section 1930 of title 28 of the United States Code, 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, will be paid in cash equal to the amount of such Administrative Claims. Debtors estimate that unpaid claims in this Class will total $10,000 or less on the Effective Date.

**c.     Ordinary Course Liabilities**

Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Claims arising from or with respect to the sale of goods or rendition of services, Administrative Claims of governmental units for taxes and Administrative Claims arising from or under those executory contracts and unexpired leases described in Article V, Section E of the Plan) will be assumed and paid by the Consolidated Entity pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without any further action by the holders of such Claims.

**d.     Bar Dates for Administrative Claims**

**i.     General Bar Date Provisions**

Except as otherwise provided in Article III, Section A.1.d.ii, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Consolidated Entity, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 90 days after the Effective Date. Holders of Administrative Claims which are required to File and serve a request for payment of such Claims and that do not File and serve a request by the applicable Bar Date will be forever barred from asserting such Claims against the Debtors or the Consolidated Entity or their respective property. Objections to such requests must be Filed and served on the Consolidated Entity and the requesting party by the later of: (A) 90 days after the Effective Date and (B) 30 days after the Filing of the applicable request for payment of Administrative Claims.

**ii.     Bar Dates for Certain Administrative Claims**

**A.     Professional Compensation**

Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including compensation requested pursuant to Section 503(b)(3) and (4) of the Bankruptcy Code by any Professional or other entity for making a substantial contribution in any Reorganization Case) must File and serve on the Consolidated Entity and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of compensation and reimbursement of expenses no later than 90 days after the Effective Date. Objections to applications of Professionals or other entities for compensation or reimbursement of expenses must be Filed and served on the Consolidated Entity and the requesting party by the later of (1)

90 days after the Effective Date and (2) 30 days after the Filing of the applicable request for payment of Administrative Claims.

### B.        Ordinary Course Liabilities

Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Claims arising from or with respect to the sale of goods or rendition of services, Administrative Claims of governmental units for taxes and Administrative Claims arising from or under those executory contracts and unexpired leases described in Article V, Section E) will not be required to File or serve any request for payment of such Claims. Such Claims will be satisfied pursuant to Article III, Section A.1.c of the Plan.

### 2.        Payment of Priority Tax Claims.

Pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or the Consolidated Entity, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of such Claim, regular equal installment cash payments, over a period not exceeding five years from the date of the entry of the orders for relief in the Debtors' cases which have a total value, as of the Effective Date, equal to the Allowed amounts of the Priority Tax Claims. Priority Tax Claims will accrue interest at the rate of seven percent (7%) per annum. Payments will be made on Quarterly Distribution Dates. Unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Consolidated Entity, the first payment will be payable six (6) months after the Effective Date or, if the Priority Tax Claim is not allowed within six (6) months after the Effective Date, the first Quarterly Distribution Date after the date on which (a) an order allowing such Claim becomes a Final Order or (b) a stipulation regarding the amount and nature of such claim is executed by the Consolidated Entity and the Claim holder; provided however, that the Consolidated Entity will have the right to pay any Priority Tax Claim, or any remaining balance of such Claim, in full, at any time on or after the Effective Date, without premium or penalty. Debtors estimate that the total of all Priority Tax Claims will be $73,000 as of the Effective Date.

### B.        Classified Claims and Interests

### 1.        Unimpaired Classes of Claims (Not entitled to vote under Plan)

### a.        Class 1 Claims (Priority Claims).

On the Effective Date, each holder of an Allowed Class 1 Claim will receive cash equal to the amount of such Claim.

### b.        Class 2 Claims (Small Unsecured Claims).

On the Effective Date, each holder of an Allowed Class 2 Claim will receive cash equal to one hundred percent (100.00%) of the amount of such Allowed Claim. Debtors believe approximately 175 claimants will fall into this Class or elect to have their claims be paid as Class 2 Claims. Payment of these claims under Class 2 as proposed will allow the Debtors to avoid the time and expense of issuing and mailing more than 1,760 checks, in very small amounts, over a

three-year period. Debtors estimate the total distributions to be paid to all Class 2 Claims as of the Effective Date will be approximately $30,000.

### c.    Class 3 Claims (Secured Claims Not Classified in Class 4).

On the Effective Date, each holder of an Allowed Class 3 Claim will have its Allowed Claim Reinstated. Any Allowed Class 3 Claims which are held by any taxing authority shall be paid in full over the course of the Plan in the form of equal payments on each Quarterly Distribution Date, with interest to accrue on the Allowed Class 3 Claim at the rate of seven percent (7%) per annum until paid in full. The Claims in this Class are generally composed of several small vehicle loans and small state tax claims whose balances total less than $46,000 in the aggregate.

### 2.    Impaired Classes of Claims and Interests (Entitled to vote under Plan)

### a.    Class 4 Claims (Trust Claims).

(i)    The Trusts shall receive Five Million Nine Hundred Thirty-Five Thousand Dollars ($5,935,000) on account of the Trust Claims, to be allocated $2,270,137.50 to the 1998-C Trust and $3,664,862.50 to the 1998-D Trust. In the event the Trusts receive payment pursuant to the subparagraphs 2.b.(ii)or (iii) below, the payment shall be allocated thirty and one-quarter percent (30.25%) to the 1998-C Trust and sixty-one and three-quarters percent (61.75%) to the 1998-D Trust. The payment on the Trust Claims shall be amortized over a twenty (20) year period and paid in full over the course of not more than twelve (12) months from the Confirmation Date. Payment shall be in the form of equal monthly installments of $50,033.83 each, beginning thirty (30) days after the Confirmation Date and continuing on the same day of each and every month thereafter, until all amounts due the Trusts under the Plan have been paid in full. A balloon payment of all remaining amounts due the Trusts under the Plan shall be due and payable on or before the expiration of twelve months after the Confirmation Date. Interest on the Trust Claims shall accrue from the Confirmation Date at the rate of eight and six-tenths percent (8.60%) per annum.

(ii)    In lieu of the amount stated in subparagraph 2.a.(i), above, the Trusts shall accept the sum of Five Million, Five Hundred Thirty-Five Thousand Dollars ($5,535,000), together with interest at the rate of eight and six-tenths percent (8.60%) per annum from the Confirmation Date to the date of payment, less all payments previously received by Trusts pursuant to subparagraph 2.a.(i), above, in full satisfaction of all Trust Claims, if said sum is received by the Trusts in immediately available funds on a date which is not more than six (6) months after the Confirmation Date.

(iii)    In lieu of the amount stated in subparagraphs 2.a.(i) and (ii), above, the Trusts shall accept the sum of Five Million, Seven Hundred Thirty-Five Thousand Dollars ($5,735,000) together with interest at the rate of eight and six-tenths percent (8.60%) from the Confirmation Date through the date of payment, less all payments previously received by the Trusts pursuant to subparagraph 2.a.(i), above, in full satisfaction of all Trust Claims if said sum is received by the Trusts in immediately available funds on a date which is more than six (6) months but not more than nine (9) months after the Confirmation Date.

(iv)     The Trusts shall retain their pre- and post-petition liens on the assets of the Debtors under the Prepetition Loan Documents to secure payment under the Plan, all of which liens were affirmed and acknowledged pursuant to the Cash Collateral Order and all of which are hereby reaffirmed.  The Debtors or the Consolidated Entity will execute and deliver any and all documents reasonably deemed necessary by the Trusts to evidence the Trusts' continued liens. The Trusts shall immediately release all said liens upon payment of the sums described in either subparagraph (i), (ii) or (iii), in a timely manner.

**b.        Class 5 Claims (General Unsecured Claims).**

Each holder of an Allowed Class 5 Claim will receive a distribution equal to five percent (5.00%) of the amount of its Allowed Class 5 Claim.  Such distributions will be paid in the form of twelve (12) equal quarterly cash distributions without interest.  Distributions will be made on each Quarterly Distribution Date.  Additionally, all claimants holding Allowed Class 5 Claims shall be beneficiaries of the Litigation Trust and shall be entitled to all net recoveries of the Avoidance Actions which will be paid by the Litigation Trust Manager on a Pro Rata basis to the holders of Allowed Class 5 Claims, according to the terms set forth in Article XII of the Plan. Based on the figures available to the Debtors, the Debtors estimate that the pro rata share of the net recoveries of the Avoidance Actions which will be distributed to all holders of Class 5 Claims will result in an approximately three percent (3.00%) additional distribution to holders of Class 5 Claims, for a total distribution of approximately eight percent (8.00%).

The Debtors estimate that Allowed Class 5 Claims will be held by approximately 17 creditors and will total approximately $1,730,000, including trade debt of each Debtor in the following approximate amounts:  (a) Te-Kon - $325,000, (b) Te-Khi - $475,000, and (c) Service Center - $125,000.

**c.        Class 6 Interests (Interests on Account of Old Common Stock of the Debtors).**

Upon consummation of the Consolidation Merger, each share of Old Common Stock of the Debtors will be cancelled and the holders of such interests will be paid nothing under the Plan.

## ARTICLE VI

## CONFIRMATION PROCEDURES

**A.     Restrictions On Solicitation Of Votes**

No information concerning the Debtors or any of their assets or liabilities has been authorized by the Bankruptcy Court to be disseminated in connection with the solicitation of acceptances or rejections of the Plan other than as set forth in this Disclosure Statement.  No party has been authorized to solicit acceptances or rejections of the Plan other than the Debtors. Any inducements to secure acceptance or rejection of the Plan other than as contained in this Disclosure Statement should not be relied upon by creditors in voting on the Plan. Any such information or inducement should be reported immediately to any Debtor for further action as may be appropriate before the Bankruptcy Court.

**B.      Classes Entitled to Vote**

There are 6 Classes of Claims and Equity Interests under the Plan.  Classes 4, 5 and 6 are entitled to vote to accept or reject the Plan.

**C.      Voting On the Plan**

In order to vote on the Plan, each holder of a Claim in the Classes of Claims entitled to vote, whose Claim has been Allowed under Bankruptcy Code Section 502 or Rule 3018 or by order of Bankruptcy Court, should complete the enclosed ballot and return it to the following address so that it is received by 4:00 p.m. on or before the date set forth on the official ballot and its instructions:

United States Bankruptcy Court
One Division Avenue, NW, Room 200
Grand Rapids, Michigan  49503
Attn:   Clerk

*Only those ballots returned in a timely manner will be counted in determining whether a particular class of creditors has accepted or rejected the plan.*

**D.      Confirmation Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Bankruptcy Court will schedule a hearing to consider confirmation of the Plan (the "Confirmation Hearing") and has directed that notice of the hearing be transmitted to all parties in interest. The Confirmation Hearing will be held before the Honorable Jeffrey R. Hughes, United States Courthouse and Federal Building, 410 West Michigan Street, Room 114, Kalamazoo, Michigan  49007.  You will receive notice of the Confirmation Hearing.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than by announcement of the next adjourned date at the Confirmation Hearing or any adjourned Confirmation Hearing. At the Confirmation Hearing or any adjourned Confirmation Hearing, the Bankruptcy Court shall enter an order confirming the Plan if sufficient acceptances thereof have been received by creditors entitled to vote on the Plan and if all other statutory requirements have been satisfied.

**E.      Acceptances Necessary for Confirmation.**

**1.      <u>Impaired Classes of Claims</u>.**

With respect to any Class of Claims which is impaired and entitled to vote, such Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class that vote on the Plan.

2.    **Cramdown.**

If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired Class is deemed to have rejected the Plan, the Debtors reserve the right (a) to undertake to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code and (b) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order. If all of the requirements of Section 1129(a) of the Bankruptcy Code are met other than the acceptance of the Plan by each Class of Impaired Claims or interests, the Bankruptcy Court, on the request of the Debtors, shall confirm the Plan pursuant to Section 1129(b) of the Bankruptcy Code if the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class that has not accepted the Plan. This ability of the Bankruptcy Court to confirm the Plan notwithstanding the existence of one or more dissenting Impaired Classes has been referred to as the "cramdown" power.

In addition to a determination that the Plan does not discriminate unfairly and is fair and equitable with respect to each dissenting Impaired Class, exercise of the cram down power requires that at least one Impaired Class accept the Plan. The determination of whether at least one class has accepted the Plan must be made without including the acceptance of any insider of the Debtors as that term is defined under Section 101(31) of the Bankruptcy Code.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Debtors believe that Plan does not unfairly discriminate against any Impaired Class that may not accept or otherwise consent to the Plan.

The Debtors believe that under the Plan: (a) all Impaired Classes are treated in a manner which is consistent with the treatment of other similar classes; and (b) no Class will receive payments or property with an aggregate value greater than the sum of the Allowed Claims in such class. The Debtors believe that Plan does not discriminate unfairly as to any impaired Class.

F.    **Assumption of Contracts and Leases.**

The Plan constitutes a motion by the Debtors to assume all previously unrejected pre-petition executory contracts and unexpired leases to which the Debtors are a party. Any executory contracts or unexpired leases which (a) have not expired by their own terms on or prior to the Effective Date, (b) have not been assumed and assigned or rejected with the approval of the Bankruptcy Court on or prior to the Effective Date; or (c) are not the subject of a motion to assume or reject the same which is pending as of the Effective Date, or within 20 days thereafter, shall be assumed by the Debtors as of the Effective Date, pursuant to the procedures described in Article V of the Plan.

G.    **Provisions Regarding Release and Discharge.**

As of the Effective Date, except as set forth in the Plan, all Persons that have held, currently hold or may hold a Claim or other debt or liability or Equity Interest that is addressed in the Plan are permanently enjoined from taking any of the following actions on account of such

Claims, debts, liabilities or interest, other than actions brought to enforce any rights or obligations under the Plan: (i) commencing or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting (A) the Debtors, the Consolidated Entity or their respective properties, or (B) the Litigation Trust Manager or any of the property held in the Litigation Trust for the benefit of the holders of Allowed Class 5 Claims; (ii) enforcing, levying, attaching (including without limitation, any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against (A) the Debtors, the Consolidated Entity or their respective properties, or (B) the Litigation Trust Manager or any of the property held in the Litigation Trust for the benefit of the holders of Allowed Class 5 Claims; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien or other encumbrance of any kind against (A) the Debtors, the Consolidated Entity or their respective properties, or (B) the Litigation Trust Manager or any of the property held in the Litigation Trust for the benefit of the holders of Allowed Class 5 Claims; (iv) asserting any right of subrogation or recoupment, directly or indirectly, against any debt, liability or other obligations due to (A) the Debtor, the Consolidated Entity or their respective properties, or (B) the Litigation Trust Manager or any of the property held in the Litigation Trust for the benefit of the holders of Allowed Class 5 Claims, (v) commencing or continuing, in any manner or any place, any action that does not comply with or is inconsistent with the provision of the Plan or the Confirmation Order and (vi) prosecuting or otherwise asserting any right, claim or cause of action released pursuant to the Plan.

In the event of a conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, all property of the Debtors, including but not limited to (a) those assets transferred pursuant to this Plan to the Litigation Trust and (b) property acquired subsequent to the commencement of the Chapter 11 Case and subsequent to the Effective Date of this Plan, shall revest in the Debtors' Bankruptcy Estates. The intention of this revesting provision is that the Chapter 7 bankruptcy estate, in the event of such conversion, shall consist of all property of the Debtors as of the date of conversion, as if the date of conversion constituted the "commencement of the case" under Section 541 of the Bankruptcy Code. However, a conversion of the Chapter 11 Case shall not have any impact on any distributions that may have been made by the Debtors, the Consolidated Entity, or the Litigation Trust Manager as provided for in the Plan prior to such conversion of the Chapter 11 Case.

## ARTICLE VII

## DISTRIBUTIONS

The minimum amount distributed to holders of Allowed Class 5 Claims under the Plan will be five percent (5.00%) of each Allowed Class 5 Claim. However, the total amount of additional distributions to holders of Allowed Class 5 Claims under the Plan is uncertain due to the Litigation Trust. The Litigation Trust Manager will investigate, analyze, and prosecute Claims and Causes of Action, including, without limitation, Avoidance Actions, which may bring additional proceeds into the estate. The amount of distributions available to holders of Allowed Class 5 Claims on account of the Causes of Action to be investigated, analyzed, and prosecuted by the Liquidating Trust Manager is speculative. Without factoring collectability

concerns, the Debtors believe that gross recoveries related to the Avoidance Actions could exceed $50,000.

## ARTICLE VIII

## ACCEPTANCE AND CONFIRMATION

**A.    General Requirements**

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that (1) the Plan has classified claims in a permissible manner; (2) the contents of the Plan comply with the requirements of Chapter 11 of the Bankruptcy Code, including the "best interests of creditors" and feasibility tests; (3) the Debtor has proposed the Plan in good faith; and (iv) the Debtor's disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan and the Chapter 11 Case, as well as the identity and affiliation of, and compensation to be paid to all insiders. The Debtor believes that all of these conditions have been met or will be met and will seek rulings of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

The Bankruptcy Code also requires that the Plan be accepted by the requisite votes of holders of Claims, that the Plan be feasible, and that confirmation be in the "best interest" (absent unanimity) of the holders in each impaired Class of Claims. To confirm the Plan, the Bankruptcy Court must make independent findings that all these conditions are met, even if all Classes of creditors accept the Plan by the requisite votes. The classification, "best interests" and feasibility conditions to Confirmation are discussed below.

**B.    Liquidation Analysis**

As set forth more fully above, the Trusts have first liens on substantially all of the Debtors' assets, with the exception of the Avoidance Actions. These liens secure claims of approximately $8,900,000.00. The value of the Debtors' assets is significantly less than the amounts owed to the Trusts. Attached to this Disclosure Statement as **Exhibit A** is a copy of a summary appraisal report of the Debtors as a going concern entity showing a fair market value of $1,800,000.00 for Te-Kon and PH and $2,800,000.00 for Te-Khi and Service Center.

Given that the Trusts' claims exceed the value of the Debtors' assets, the holders of unsecured claims against the Debtors will receive nothing in a Chapter 7 liquidation with the exception of the net proceeds of any Avoidance Actions which a Chapter 7 Trustee may pursue. Under this plan, holders of unsecured claims will receive five percent (5.00%) of their allowed claims in addition to their share of the net proceeds recovered by the Litigation Trust.

Additionally, in a Chapter 7 liquidation, the proceeds of the Avoidance Actions would be shared on a pro rata basis with the unsecured portion of the Trusts' claims. The Trusts do not share in the Avoidance Action proceeds under the Plan. Debtors estimate that the unsecured portion of the Trusts' claims in a Chapter 7 proceeding would be approximately $5,400,000. Therefore, the Debtors estimate that the unsecured creditors' share of the Avoidance Action proceeds would be reduced by approximately eighty-five (85%) in a Chapter

7 liquidation. The Debtors also believe the fees and professional expenses of the Litigation Trust Manager under this Plan will be less than the commissions and professional fees of a Chapter 7 Trustee. As a result, more monies will be available for Class 5 unsecured claimants.

Based on these factors, the Debtors believe that Class 5 unsecured creditors will receive significantly more under the Plan than they would receive in a Chapter 7 liquidation of the Debtors. In addition, the Debtors believe that unsecured creditors will receive their distribution sooner under this Plan than if the Debtors were liquidated in Chapter 7.

## C.    Feasibility

The Debtors' Plan is also feasible. Attached to this Disclosure Statement as **Exhibit B** are financial statements showing the Debtors' performance since their bankruptcy filings through March 2006. Attached as **Exhibit C** are the financial projections for the Consolidated Entity post-Confirmation. As can be seen, the projections show that the Consolidated Entity will be able to service the Class 4 Trust Claims, as well as satisfy (a) its obligations to other Creditors of the Debtors under the Plan and (b) its current obligations going forward.

With respect to the Consolidated Entity's financial projections post-Confirmation, Debtors propose to cease operating as "AMBEST" facilities. AMBEST is a group of less than 100 independently owned truck stops/travel plazas which was formed to sell fuel to trucking companies. Two years ago, AMBEST had 160 members. Many truck stops have left AMBEST in the past two years, especially in light of the fact that many of the independently owned truck stops have been acquired by major chains or converted to franchises.

On the other hand, Petro franchises are recognized as some of the best and most desirable truck stop/travel plaza franchises in numerous surveys of professional truck drivers. Debtors propose to become a Petro franchise post-Confirmation. Becoming a Petro franchise will open the Debtors to several national trucking accounts with which they do not presently do business. This will increase the Debtors fuel, repair and parts sales. Further, becoming a Petro franchise will lower the cost of goods sold through the group buying which Petro would provide. The cost of becoming a Petro franchise is shown as a line item on the Debtors' projections. The initial franchise fee is $50,000.00. As set forth above, the benefits of becoming a Petro franchise will result in higher margins and profit for the Consolidated Entity. This benefit more than justifies the cost of the franchise.

The projections, inventory and working capital turnovers as well as the cost of goods and expenses, are projected from the Debtors' historical experiences. In late 2005, the Debtors ceased operating the truck repair division of their business at the Tekonsha, Michigan location. Since the truck repair facility at this location has historically operated at or below the break-even point on a cash flow basis, the Debtors do not believe this will have a significant affect on their projections or their ability to meet their obligations under this Plan.

## ARTICLE IX

### ALTERNATIVES TO THE PLAN

Given the Trusts' interest in substantially all of the Debtors' assets which secure the Trusts' Claims, the alternative to the Debtors' Plan is for the Trusts to take possession of, and liquidate, the Debtors' assets. This would force the Debtors to cease operations and convert to a case under Chapter 7 of the Bankruptcy Code. Under this scenario, holders of unsecured Claims against the Debtors would only receive their Pro Rata share of the Avoidance Actions. These are speculative at best.

In short, the Debtors believe that liquidation of their assets under Chapter 7 would result in a significantly lower return for creditors over a longer period of time than that contemplated by the Plan.

### ARTICLE X

### CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any other alternative because it will result in greater and more timely distributions to holders of Claims than a liquidation under Chapter 7 of the Bankruptcy Code. The Debtors, therefore, strongly recommend that creditors vote to accept the Plan.

Dated: _5 / 3_ , 2006

Te-Kon Travel Court, Inc.
Te-Khi Travel Court, Inc.
Te-Khi Service Center, Inc.
Petroleum Holdings, Inc.

By: _Stephen K Bedwell_

Stephen Bedwell
Their President

**MILLER JOHNSON**
Counsel to the Debtors

By _[signature]_

John T. Piggins (P34495)
Robert D. Wolford (P62595)
Business Address:
    P.O. Box 306
    Grand Rapids, Michigan  49501-0306
Telephone:  (616) 831-1700
Facsimile:  (616) 988-1798